IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD BATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 13 C 2731 |
| v. | ) |
| | ) Jeffrey T. Gilbert |
| CAROLYN W. COLVIN, | ) Magistrate Judge |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY,[1] | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant Richard Bates ("Claimant") brings this action under 42 U.S.C.§ 405(g) seeking reversal or remand of the decision of Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 for all proceedings, including entry of final judgment [ECF No. 9].

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 12, 16. For the reasons discussed herein, the Commissioner's motion for summary judgment [ECF No. 16] is denied. Claimant's motion for summary judgment [ECF No. 12] is granted, and this matter is remanded to the Social Security Administration ("SSA") for further proceedings consistent with this Memorandum Opinion and Order.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically substituted as the Defendant-Respondent in the case. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits on March 2, 2011, alleging a disability onset date beginning February 1, 2011. R. 26, 205-12. The SSA initially denied the application on May 24, 2011, and upon reconsideration on August 8, 2011. R. 26, 109-12. Claimant filed a timely request for an administrative hearing (R. 26), which was held before ALJ Sylke Merchan on October 1, 2012 (R. 26, 42-108). Claimant personally appeared and testified at the hearing, and he was represented by counsel. R. 42-108. Dr. Cathy Krosky, a medical expert ("ME"), and Richard Fisher, a vocational expert ("VE"), also testified. *Id.*

The ALJ issued a written decision on October 26, 2012, finding Claimant not disabled under the Social Security Act. R. 26-37. At step one of the required five-step sequential evaluation process, the ALJ found that Claimant engaged in substantial gainful activity ("SGA") during the first, second, and fourth quarters of 2011, but that Claimant had not engaged in continuous SGA since the alleged onset date. R. 28-29. Thus, the ALJ's opinion addressed the periods in which Claimant's earnings did not meet the SGA threshold, "namely the third quarter of 2011 and all of 2012 through the date of [the] decision." R. 29. At step two, the ALJ found that Claimant had the severe impairments of degenerative disc disease in the cervical spine, chronic episodic sinusitis, and an inguinal hernia. *Id.* At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526). *Id.*

The ALJ determined that Claimant had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that he

was unable to climb ladders, ropes, or scaffolds; could only occasionally use foot controls; was unable to do any overhead bilateral reaching; was unable to drive or operate machinery; and must avoid hazards such as heights and machinery. R. 30. At step four, the ALJ found that Claimant was capable of performing his past relevant work as a resident supervisor, and therefore concluded that Claimant was not disabled. R. 35.

The Social Security Appeals Council denied Claimant's request for review on February 20, 2013, leaving the ALJ's decision as the final decision of the Commissioner. R. 1-6. Claimant seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. LEGAL STANDARD

### A. Standard of Review

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the

3

conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act.[1] *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . .

---

[1] The standard for determining "disability" for SSI is "virtually identical" to that used for disability insurance benefits ("DIB"). *Hankerson v. Harris*, 636 F.2d 893, 895 n.2 (2d Cir. 1980); *see Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."); *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007); *Knipe v. Heckler*, 755 F.2d 141, 145 n.8 (10th Cir. 1985). Accordingly, this Court cites to both SSI and DIB cases.

4

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III. BACKGROUND FACTS

#### 1. Claimant's Medical History

Claimant suffers from back, neck, and arm pain dating back to at least 2006. In November 2006, Claimant underwent a cervical spine MRI which revealed "multilevel changes of disc degeneration and degenerative spondylosis with multilevel disc bulging" and "mild straightening of the cervical spine." R. 278-79. Another cervical spine MRI in June 2010 confirmed multilevel degenerative changes, including moderate to severe foraminal narrowing. R. 401. Claimant underwent an x-ray of his lumbar spine in March 2011, which revealed mild osteoarthritis with chronic degenerative discs. R. 448.

5

Claimant also complained of dizziness, blurred vision, and headaches. In May 2010, he went to the emergency room complaining of headache, dizziness, and blurry vision which had lasted for over a year. R. 318-19. His CT scan was normal, but his physician suggested sinusitis could be causing his headaches. R. 322. He visited Northwestern Hospital in February 2011 and September 2012, again complaining of dizziness and headaches, and was scheduled for an MRI of the head and neck. R. 400, 471-73. On October 24, 2012, shortly after his hearing before the ALJ, Claimant underwent a CT angiography of the head ("CT Angiography"). R. 274. The CT Angiography revealed, among other things, the existence of an aneurysm at the anterosuperior aspect of the right supraclinoid/parapthalmic ICA. *Id.*

### 2. Claimant's Testimony

Claimant was born on May 11, 1951, and was 59 years old as of his alleged onset date. R. 50. He received a bachelor's degree in political science in 1976 and a master's degree in inner city studies and education in 2008. R. 53-54. As of the date of his hearing before the ALJ, Claimant worked part-time as a substitute teacher for the Chicago Public Schools ("CPS"). R. 57, 66. He previously worked as a social services case manager, assisting mentally ill adults with daily activities. R. 62-63. Claimant testified that he is single, lives alone, and does not have children. R. 53.

Claimant testified that he works two to three seven-hour days per week with CPS and that he often has to take a day off in between substitute teaching jobs in order to recover. R. 62. Though CPS calls him to teach five days per week, he has to turn down assignments two or three times per week due to his impairments. R. 66. On the days he does work, he has to rest throughout the day to ease his back pain and dizziness. R. 63. Claimant explained that he

"suffers in silence" and only works so that he does not "starve to death." R. 60, 67. He also applied for unemployment benefits while his disability application was pending and, as required by the unemployment application, applied for full- and part-time jobs. R. 58-59.

Claimant takes 20-minute walks throughout his neighborhood about three times per week in order to stretch, although he has to pause during his walks so he does not aggravate his symptoms. R. 81, 85. He goes to the gym at least three times per week to soak in the whirlpool, use the sit-up machine, and do light arm exercises, which help his back pain and hernia pain. R. 81-82. He prepares his own meals, but mostly uses the microwave because cooking aggravates his symptoms. R. 83. He cleans his own apartment a little bit at a time and does his own laundry. R. 83-84. He can grocery shop, but he must use a wheeled cart to carry his groceries inside. R. 85.

### 3. ME Testimony

The ME testified that Claimant had extensive degenerative disc disease of the cervical spine, and opined that Claimant's headaches are very likely secondary to his cervical spine disease. R. 87. She testified that Claimant's chronic acute sinusitis might be the cause of his dizziness. *Id.* She interpreted the November 2006 cervical spine MRI to mean Claimant suffered "severe arthritis through the neck" and opined that he was having "pretty significant" neck muscle spasms. R. 88. She noted that the June 2010 cervical spine MRI showed multilevel degenerative changes with a disc "actually breaking through the membrane," and found Claimant to have "really extensive disease at multiple levels." R. 90-91. She found Claimant's dizziness complaints to be "very believable" and suggested Claimant might periodically miss days of work because of his dizziness. R. 97-98.

7

When asked by the ALJ whether Claimant's impairments met a listing, either individually or in combination, the ME acknowledged that Claimant "has very serious changes on his MRI, and an actual ruptured disc," but said that she "just couldn't piece it all together" because "no one has really sat down and done a real thorough exam." R. 96-97. She opined that Claimant would be able to work, "at most," at a sedentary level. R. 97.

## IV. DISCUSSION

Claimant argues that the decision of the Administrative Law Judge ("ALJ") denying his applications for disability insurance benefits should be reversed or, alternatively, should be vacated and this case should be remanded to the SSA for further proceedings. In support of his motion for summary judgment, Claimant raises the following issues: (1) whether the ALJ erred in discrediting Claimant's testimony regarding his physical limitations; (2) whether the ALJ failed to build a logical bridge between Claimant's symptoms and the conclusion that he can sustain full-time work; and (3) whether the Appeals Council improperly failed to consider new and material evidence. Claimant's Brief at 7, ECF No. 13.

After reviewing the parties' briefs and the administrative record, the Court determines that there is new and material evidence that should be considered by the Commissioner. Remand is therefore appropriate.

### A. New and Material Evidence

Claimant argues that the October 2012 CT Angiography constitutes "new and material evidence" that warrants a remand so that the evidence can be considered by the Commissioner. *Id.* at 14-15. For the reasons set forth below, the Court agrees.

Pursuant to sentence six of 42 U.S.C. § 405(g), remand is appropriate if a claimant shows "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). To prevail on this issue, the claimant must satisfy the requirements of newness, materiality, and good cause. *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). If the claimant fails to satisfy all three elements, the Commissioner's decision must be affirmed.

### 1. Newness

The Court finds that Claimant's CT Angiography is "new" evidence. For sentence six purposes, evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). "Derivative evidence," however, is not considered new. *See, e.g., Perkins v. Chater*, 107 F.3d at 1296 (physician evaluation submitted after the ALJ's opinion but based entirely on evidence already considered by the ALJ was not new); *Sample v. Shalala*, 999 F.2d at 1144 (medical conclusion submitted after the ALJ's opinion but based on evidence in the administrative record was not new).

The record reflects that Claimant underwent the CT Angiography on October 24, 2012, roughly three weeks after his hearing before the ALJ. R. 274. Thus, these test results were not available to him at the time of the administrative proceeding. In addition, the new test result evidence in this case is based on clinical tests administered after the hearing. This sort of evidence is distinguishable from "derivate evidence" that does not qualify as new under sentence six. *Bush v. Astrue*, 571 F.Supp.2d 866, 874; *see also Simila v. Astrue*, 573 F.3d 503, 522 (7th

9

Cir. 2009) (suggesting that new medical testing is not "derivate evidence"). Accordingly, the Court finds that Claimant has satisfied the newness requirement of sentence six and proceeds to materiality.

## 2. Materiality

The Court also finds that Claimant has met his burden of proving that the new evidence is "material." "New evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). Additionally, new evidence is material "only if it is relevant to the claimant's condition during the relevant time period encompassed by the disability application under review." *Id.* (internal quotations omitted). Evidence that speaks only to the claimant's current condition, and not to his condition at the time his application was under administrative review, is not considered material. *Id.* (quoting *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989)).

Here, Claimant complained of dizziness, blurred vision, and headaches to his physicians prior to his hearing. *See, e.g.*, R. 400, 471. He received treatment and underwent various procedures in an effort to diagnose what might have been causing his symptoms prior to his hearing. *Id.* He testified about these symptoms at his hearing. R. 63, 65, 68, 74. The CT Angiography occurred less than a month after his hearing. Accordingly, there is no question the new evidence is relevant to the time period encompassed by Claimant's disability application. *See Bush v. Astrue*, 571 F.Spp.2d at 875 (finding test results obtained three months after the ALJ's decision to be material due, in part, to the "minimal lapse of time" between the testing and the ALJ's opinion).

The Court also finds a "reasonable probability" that the ALJ would have reached a different conclusion had the new evidence been before her. The October 2012 CT Angiography revealed an aneurysm at the anterosuperior aspect of the right supraclinoid/paraphthalmic ICA, which provides an objective medical cause for Claimant's symptoms. R. 274. This new evidence is especially material considering the fact that the ALJ found Claimant's "subjective complaints of disabling impairments [] not entirely credible," in part because they were "not fully supported by objective medical evidence." R. 33. The ALJ says, for example, that the medical records before her "show mostly benign and minimal findings, suggesting that [Claimant's] impairments may not be as severe or limiting as alleged," and determined Claimant's medical records revealed "mild findings during examinations and tests." *Id.* Moreover, the ALJ found that Claimant's blurred vision was not a severe impairment – that is, did not "more than minimally affect [Claimant's] functional abilities in the workplace" – *specifically due to a paucity of medical evidence.* R. 29 (emphasis added). The ALJ similarly did not recognize Claimant's headaches or dizziness as impairments that would more than minimally affect his abilities in the workplace. *Id.*

Thus, although the ALJ purported to "account for all of these [headache, dizziness, and blurred vision] limitations in [Claimant's] residual functional capacity" (R. 34), it is clear that the ALJ did not believe Claimant's complaints regarding these symptoms. The new evidence establishes an objective cause for these symptoms. *See* "Understanding: Warning Signs/Symptoms," Brain Aneurysm Foundation, http://www.bafound.org/node/14 (last visited December 9, 2014) (listing headache, blurred or double vision, and dizziness among brain aneurysm symptoms) (cited in Claimant's Brief at 14, ECF No. 13). The new evidence lends

11

support to Claimant's testimony that his symptoms are debilitating and undermines the ALJ's adverse credibility analysis. As such, there is a reasonable probability that the ALJ would have reached a different conclusion if this evidence was before her. *See Bush v. Astrue*, 571 F.Supp.2d at 875 (citing cases that found new evidence to be material where the evidence might have reasonably affected the ALJ's credibility determination).

The Commissioner argues that the new evidence is not material because the ALJ purported to accommodate Claimant's complaints of dizziness, headaches, and blurred vision by limiting him to work that does not involve balancing or exposure to heights, hazards, driving, or machinery. Commissioner's Brief at 15, ECF No. 17. The Commissioner further argues that these restrictions were consistent with the ME's testimony that Claimant's symptoms in these areas would warrant such limits. *Id.* The ME found Claimant's complaints "very believable" and the ALJ gave "great weight" to the ME's opinion. Thus, the Commissioner argues, the ALJ already credited Claimant's symptoms and the new evidence would not have changed her opinion. *Id.*

The Court disagrees. While it is true that the ME found Claimant's complaints of dizziness to be "very believable" (R. 97) and that the ALJ gave "great weight" to the ME's opinion (R. 34), it is also true that the ME opined (consistent with Claimant's testimony) that Claimant's dizziness would likely require him to periodically miss work. R. 98. The ALJ does not include this possibility in her RFC assessment. As such, it is inaccurate to say that the ALJ adequately addressed Claimant's symptoms merely by limiting him to work that does not involve balancing or exposure to heights, hazards, driving, or machinery.

### 3. Good Cause

Lastly, the Court determines that Claimant has shown "good cause" for not obtaining the new evidence prior to the administrative proceeding. A claimant shows "good cause" if he demonstrates "sufficient reason for failing to incorporate the evidence into the record during the administrative proceeding." *Sample v. Shalala,* 999 F.2d at 1144. The record reflects that Claimant sought and received treatment for his symptoms well before his hearing. In May 2010, he went to the emergency room complaining of headache, dizziness, and blurry vision which had lasted for over a year. R. 318-19. His CT scan was normal, but his physician suggested sinusitis could be causing his headaches. R. 322. He visited Northwestern Hospital in February 2011 and September 2012, again complaining of dizziness and headaches, and was scheduled for an MRI of the head and neck. R. 400, 471-73. The record and these facts convince the Court that Claimant had been attempting to find the cause of his symptoms throughout the pendency of his disability application. In other words, "this not a case of 'sandbagging' by a claimant who loses and hopes to get another chance at obtaining benefits by bringing in new evidence." *Sears v. Bowen,* 840 F.2d 394, 400 (7th Cir. 1988).

Claimant has demonstrated the newness, materiality, and good cause requirements of sentence six of 42 U.S.C. § 405(g). Pursuant to that statute, the Court remands this case to the Commissioner for consideration of Claimant's new medical evidence.

### B. Credibility

Claimant argues that the ALJ's adverse credibility analysis is not supported by substantial evidence. Claimant's Brief at 8-13, ECF No. 13. As discussed above, this case is being remanded so that the ALJ can consider the new and material evidence that became available after

Claimant's hearing. At this point, the Court is not reviewing the ALJ's credibility determination. Upon remand, however, the ALJ should revisit her credibility determination to ensure it is supported by substantial evidence because, although the Court is not formally reviewing the ALJ's credibility determination, it agrees with Claimant that the ALJ's credibility determination suffers from a number of analytical problems.

The ALJ is in the best position to determine a witness's truthfulness, and this Court will not overturn an ALJ's credibility determination unless it is patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). However, the basis for the ALJ's credibility determination must be articulated and sufficiently specific to make clear to a claimant and subsequent reviewers the weight given to a claimant's statements and the reasons for the weight given. SSR 96–7p. The reasons for the ALJ's credibility finding must be grounded in the evidence and articulated in the decision. SSR 96-7p. The ALJ must consider the entire case record in determining credibility, and statements about intensity or persistence of symptoms or about the effect of symptoms on functioning may not be rejected simply because they are not substantiated by objective medical evidence. *Id.*

Here, the ALJ cites three factors in support of her adverse credibility finding. First, the ALJ concluded that Claimant's ability to perform part-time work as a substitute teacher and his application for unemployment benefits demonstrated that he was wanting, willing, and able to work. R. 33. Second, the ALJ determined Claimant's medical history to be "mostly benign" with "significant gaps," suggesting his subjective complaints were not credible. *Id.* Third, the ALJ found that Claimant engaged in a "wide range" of activities of daily living which were "inconsistent with what one would reasonably expect, given his allegations of disabling

impairments." *Id.* In making these findings, however, the ALJ fails to discuss a substantial amount of evidence that undermines her conclusion that Claimant is not entirely credible.

### 1. Claimant's Part-Time Work and Unemployment Benefits Application

The ALJ first points to Claimant's part-time work and application for unemployment benefits as factors detracting from his credibility. R. 33. This analysis is problematic.

Claimant testified at his hearing that he worked part-time as a substitute teacher for CPS (R. 56), which contributed to the ALJ's conclusion that Claimant's subjective complaints of disabling pain were not credible (R. 33). Nothing about Claimant's testimony regarding his part-time job, however, suggests that he would be able to sustain full-time work for eight hours a day, five days a week. Claimant repeatedly testified that he only worked part-time as a substitute teacher and, due to his impairments, was limited to two or three seven-hour days per week. R. 57, 66. He further testified that he received offers to teach five days per week, but had to turn down those opportunities as often as three days per week because of his symptoms. R. 64-66. He also needed days off in between teaching jobs to recover. R. 62. On the days Claimant did work, he had to rest throughout the day to ease his back pain and dizziness. R. 63. Claimant explained that he "suffers in silence" and only works so that he does not "starve to death." R. 60, 67.

The ALJ did not discuss any of this evidence in determining that Claimant's limited part-time work demonstrates an ability to consistently engage in substantial gainful activity on a full-time basis. Moreover, the ALJ's conclusion does not logically follow from Claimant's testimony. It is well settled that a person in dire circumstances may attempt to work despite suffering a disability. *See, e.g., Hawkins v. First Union Corp.*, 326 F.3d 914, 918 (7th Cir. 2003)

15

("A desperate person might force himself to work despite an illness that everyone agreed was totally disabling.") (citation omitted). Claimant is not married, does not have children, and lives by himself. R. 53. Thus, another conclusion that can be drawn from Claimant's testimony regarding his part-time work (and the explanation Claimant provided) is that he must do whatever is necessary to get by – even if it means "suffering in silence." R. 67. The ALJ did not consider this possibility, or, at the very least, her opinion does not reflect that she did.

Nor does the fact that Claimant applied for unemployment benefits necessarily demonstrate that he was "wanting, willing, and able to work." R. 33. The Court recognizes that a claimant's application for unemployment benefits may offer support to an ALJ's credibility determination. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). But here, as discussed above, Claimant explained that he was in a desperate financial situation – single, living alone, with no children – and was doing whatever was necessary to prevent "starving to death." R. 60, 67. That very well may explain why Claimant applied for unemployment benefits. *See Schmidt v. Barnhart*, 395 F.3d at 746. The ALJ did not discuss that possibility, however. She simply concluded that Claimant applied for unemployment benefits because he was capable of a full-time job, despite Claimant's consistent statements otherwise. R. 33.

Additionally, 20 C.F.R. § 416.20 directs SSI applicants to apply for "other benefits" for which they qualify – including unemployment benefits – and instructs SSI applicants that "you not eligible for SSI benefits if you do not apply for all other benefits for which you may be eligible." 20 C.F.R. § 416.20(a) and (b). Thus, while the ALJ is certainly entitled to take a claimant's unemployment benefits application into consideration in her credibility analysis, she should nonetheless consider the claimant's situation in its entirety before concluding that an

unemployment benefits application renders the claimant incredible. The ALJ does not appear to have done so here.

The ALJ also faulted Claimant for continuing to apply for jobs while his disability application was pending, stating that doing so "suggests that he is seriously looking for work and believes he can work." R. 33. Claimant testified that the only reason he continued to apply for jobs was because his unemployment benefits application required him to do so. R. 59. The ALJ omitted this key fact.

The ALJ need not address every piece of evidence in the record, but she is required to confront evidence that does not support her conclusion and explain why it was rejected. *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). It may be that the ALJ considered Claimant's dire financial circumstances, limited working hours, and physical difficulties while working and nevertheless concluded that Claimant was embellishing his symptoms. If that is the case, then upon remand, the ALJ should more thoroughly explain how she reached that conclusion.

### 2. Claimant's Medical History

The ALJ next points to what she determined to be "mostly benign and minimal [medical] findings" as support for her adverse credibility determination, stating that Claimant's "mild findings during examinations and tests, [his] gaps in treatment history, and his mostly conservative treatment" demonstrated that his "subjective complaints of an inability to perform work at any exertional level [were] not entirely credible." *Id.* The ALJ's analysis here, too, is problematic.

The ALJ first cites Claimant's "mild findings during examinations and tests" as a reason to find him incredible. R. 33. But the ME, upon whom the ALJ gave "great weight" (R. 34), repeatedly testified that Claimant's condition was serious. Indeed, the ME testified no less than seven times that Claimant suffered severe degenerative disc disease. ("*Extensive* degenerative disc disease" (R. 87); "*severe* cervical spine disease" (R. 88); "*severe* arthritis through the neck" and "mild straightening of the spine and lots of normal cervical lordosis," meaning Claimant "was likely having spasm of his neck muscles *pretty significantly* to loose the curve of the neck" (*Id.*); "*really extensive* disease at multiple levels, including a blatantly ruptured disc" (R. 91); "*serious* spine disease" (*Id.*); "*very serious* changes on his MRI, and an actual ruptured disc" (R. 96); "*serious* disc disease" (R. 97-98)) (emphasis added).

The ALJ did not mention any of these findings in her opinion. "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Without more explanation from the ALJ about why she disregarded this entire line of testimony (from the medical source upon whom she placed great weight, no less), it appears to the Court that the ALJ did in fact play doctor when she determined that Claimant's impairments were "mild" and "benign."

The ALJ's criticism of Claimant's "significant gaps" in treatment history is also misplaced. After noting Claimant's October 2006 emergency room visit and cervical spine MRI, the ALJ then emphasized that Claimant did not follow up with his primary care physician until "[y]ears later in the fall of 2008." R. 31. Then the ALJ faults Claimant for not following up with his primary care physician until 2010. *Id.* Yet Claimant's alleged disability onset date was not until February 1, 2011. The ALJ lists a host of providers from whom Claimant received

18

treatment after that date, including Dr. Rossnow for pain radiating into his arms and fingers; Dr. Lee for hip, neck, and leg pain; Dr. Lopez for dizziness, syncopal episodes, and hernia pain; a physician's assistant for sinusitis, hernia pain, and heart palpitations; Dr. Hsu for neck pain; a general surgeon for his hernia; and his neurologist, Dr. Nagle. R. 32-33. Claimant also had multiple emergency room visits after his alleged disability onset date. R. 32. While infrequent treatment can support an adverse credibility finding in some situations (SSR 96-7p), the record before the Court simply does not reflect that Claimant had "significant gaps" in his treatment after his alleged disability onset date.

### 3. Claimant's Activities of Daily Living

Lastly, the ALJ relied on what she deemed to be a "wide range of activities of daily living" in determining that Claimant's subjective complaints were not credible. R. 33. Again, the ALJ's analysis is lacking.

The ALJ notes that Claimant "does all of his own cooking, cleaning, shopping, and laundry." R. 33. Claimant is single, has no children, and lives by himself. The logical conclusion is that Claimant performs these routine tasks himself out of necessity. Moreover, Claimant testified that he cannot complete these tasks without difficulty. For example, his "cooking" consists mainly of placing meals in the microwave, because standing and cooking too much aggravates his symptoms. R. 83. When he cleans, he has to do a little at a time and "take it easy." *Id.* When he grocery shops, he brings a cart with him so that he can wheel his purchases inside his home. R. 85. The ALJ did not mention any of these limitations in her analysis. The Seventh Circuit has repeatedly "cautioned the [SSA] against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the

home." *Mendez v. Barnhart*, 439 F.3d 360, 361 (7th Cir. 2006). Claimant's ability to perform these limited tasks does not demonstrate that he can perform a full-time job, nor is it inconsistent with Claimant's alleged symptoms.

The ALJ also found it significant that Claimant "walks throughout his neighborhood for up to twenty minutes at a time" and "uses the gym to do sit-ups and other exercises." R. 33. Claimant testified, however, that he walks around his neighborhood "to loosen up." R. 81. He said he goes to the gym because the sit-up machine helps his back and hernia symptoms, and the whirlpool relaxes his muscles. *Id.* Upon remand, the ALJ should address Claimant's testimony that he performs these activities to mitigate his symptoms and discuss how, if at all, that affects her determination that Claimant's physical activities adversely affect his credibility.

## V. CONCLUSION

For the reasons set forth above, the Commissioner's motion for summary judgment [ECF No. 16] is denied. Claimant's motion for summary judgment [ECF No. 12] is granted, and this matter is remanded to the Social Security Administration for further proceedings consistent with the Court's Memorandum Opinion and Order.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: December 22, 2014